The next case for argument, which is Canton v. Metropolitan Life Insurance Company. Good morning. Good morning. If it pleases the court, my name is David Gabor, counsel for Ronald Canton. Ronald Canton was a 33-year award-winning career that had come crashing to a halt very shortly after he was told that he made a lot of people angry when he called into question how commissions were being paid to the 10,000 salespeople who sell the life insurance products and on the heels of being yelled at by Eric Steigerwald, a high-level senior executive with MetLife, because he was questioning the pricing. So the first question is whether a reasonable person on a jury could find that Canton's complaint regarding the pricing and the commissions led to the decision to terminate him and to refuse to even allow him to sell products. And on that issue, MetLife justifies its decision by claiming that Ron Canton didn't get along with people, he was inappropriate, and he was costing the company money. We counter that by saying that he was invited in May 2012, half a year before he was fired, to a leadership conference which, as is described by Michael Vietri, is a very selective process for people who have good numbers, who do get along, who are well-regarded. Up until the day that Canton was fired, he was still on two product committees at MetLife, and again, membership on those committees is something that is an honor only for people who are worthy of it. MetLife also tries to justify the decision by saying that Canton was costing too much money. Well, Canton's numbers in the last couple of years he worked for MetLife were very, very high. There was a question that MetLife tried to establish he wanted to bring in another administrative assistant. Actually, his current administrative assistant was transferring to another location, and he was going to be replacing that person, and as he had done in the past, paying for the person out of his own compensation, not costing MetLife any money. The focus here is that he's making a claim that he's a whistleblower under Sarbanes-Oxley. I mean, that's the nub of what we're going to talk about, right? I mean, MetLife may have had all sorts of reasons for not wanting him around. Your client wants to be treated as a whistleblower, so, right? Sure, and on that, the first problem we have is that the district court used an inappropriate standard. They said that he had to show definitive and specifically that it relates to speech to one of six enumerated categories. Well, yes, the district court said that at one point in her opinion, but then later on the district court analyzes it, it seems to me, correctly under the standard, is this something that a reasonable person would have thought was a complaint about illegal conduct? That's the standard she actually applied, and that's the correct standard, isn't it? Yeah, that is a standard from the Nielsen case and this court also in the Sharkey decision. The first time Sharkey was up at the Second Circuit, you know, had to use that standard. And your client admitted that of the three prices that he challenged, two of them he didn't even think were illegal. No, I think that was taken out of context. He made it very clear in his testimony in a couple of locations, and you can see it on page 103 and then also in the transcript, 188, 89, and also on A70. He made it very clear that you have a responsibility under U4 and FINRA that you've got to have suitability in your pricing. No, no, you have to have suitability in what you sell. Right. If you're a financial advisor, you can't sell somebody something that's not appropriate for them, right? That's correct. Is there any evidence that he believed that anyone had ever sold a policy of this type to a couple where the woman was 28 years younger than the man and they fell into the particular categories that he said the pricing was wrong for? He actually identified in his December 2011 letter, he identified three different situations where there were pricing anomalies. One was the people the same age. The question is, is there any evidence that anyone, that he even thought that anyone ever did sell an inappropriate product to anybody? He thought there was a very real probability that there would be inappropriate policies sold because there are 10,000 people outselling this product, and if you see a pricing anomaly in one, two, or three, in his case, he saw three cells, he was concerned that pricing anomaly would show up in other cells as well. It wouldn't just be this one cell and there's a nine-year difference or a 28-year difference or one where both the man and the woman are 60 years of age. He was concerned you had a systemic problem in the program, and he asked MetLife to take care of it. And as Mark Riley made very clear— Can I follow up on that, though? Sure, sure. The other thing he claims is that we would be jeopardizing our FINRA license by selling this product. That's one of his arguments, right? Absolutely. Did he ever—is there any evidence he made that argument to MetLife? Is there anything in the file? I've got the letter of December 16th where he talks about this pricing problem, but it doesn't say anything about, look, if I sell this product, I'm going to be in trouble with my license with FINRA. Did he ever make that argument? He didn't make that argument in the record we have. The one thing we don't know is the papers that were destroyed by James Riley in November 2013, long after the January 2013 claim letter was sent and long after MetLife had put in their papers was OSHA. Did he say at his deposition, I told them this, I sent letters about this license problem, but apparently they destroyed my letters? No, he didn't say that. He did use the words compliance in the December 2011 letter, and he said that you'd have a very real compliance problem, and that is in the record. But the problem that we get back to is he saw himself three different examples where there were pricing anomalies that were very clear and plain and apparent, and he asked MetLife to investigate it. MetLife came back to him and said, no, we have no problem. But then when we go through discovery, we find that MetLife admitted amongst themselves there is a problem. At deposition, Mark Riley, who is Jim Riley's brother, admitted that he wasn't supposed to waste a whole lot of time on this, according to Eric Steigerwald, and all they had to do was conduct a computer run, and they had the program run on the computer and see how many other cells would have this pricing anomaly. The real concern that Canton had is that 10,000 people are selling a product that's got serious, serious problems, and that's why he came forward at that point, and I think that constitutes a reasonable belief based upon his years of experience on committees, 33 years selling products. He's in their Hall of Fame. He's at the top of the tower, and he reasonably believed there was a problem, and he wouldn't have gone through the length he went through over several months if he didn't have a good faith belief, and others in his position could have that belief. I don't think he had to say. I don't think the law says. He's got to say it's a FINRA problem. He's got to say it's a pricing problem. It's a compliance problem. Thank you. He's got to say it's a compliance problem, right? Yeah, and he does say that. Thank you. Thank you, Mr. Gabor. You've reserved three minutes for rebuttal. Ms. Bouchard? Good morning. May it please the Court, my name is Sarah Bouchard from the law firm of Morgan Lewis, and I represent MetLife. Mr. Gabor is correct. Mr. Canton did have a successful career at MetLife, but Mr. Canton was never shy, and he was also never a whistleblower. He did not hesitate in making suggestions about pricing when he thought he should or maybe when he shouldn't, but MetLife listened to his concerns throughout his career and adopted them where appropriate. After he decided to retire in 2007, Mr. Canton entered into a special agent agreement. He was still able to sell MetLife products, but as an independent contractor. This agreement had certain protocols, however, given his propensity to jump over layers of management when he didn't like the answers that he was given. Now, this agreement allowed either party to cancel it at any time as long as notice was provided, and in September 2012, MetLife triggered the notice provisions in his agreement. His business was unprofitable due to the high administrative expenses that he was covering, and he was also ignoring key personnel at MetLife as well as demeaning the underwriters, and MetLife thought it was time for him to part ways. Although he claims that he's a whistleblower under 806 of Sarbanes-Oxley, his theory is not founded in law or fact, and the district court's grant of summary judgment should be affirmed. First, as Your Honors noted, there is no dispute that Nielsen controls here, and that's what the court based her decision on. Under that controlling authority, Mr. Canton did not engage in any protected activity because he did not possess a reasonable belief that MetLife violated a law covered by Sarbanes-Oxley. He raised only trivial concerns about a commission payment he received. He kept the commission payment after understanding the explanation and raised only speculative concerns about three hypothetical pricing scenarios where the policies were never requested or sold to any customer. Most importantly— Did MetLife have to have sold one of these policies to be able to raise it, though, as a Sarbanes-Oxley violation? Is that a requirement? He can certainly raise it, but he has to have a reasonable belief that MetLife is violating the law. And— And the laws in question are basically fraud laws, right? Right. Either securities laws or mail fraud and things of that sort. Exactly, Your Honor. And pricing's transparent. I mean, these are high net worth individuals who are shopping for sophisticated life insurance products. They're given the prices, and Mr. Canton stated in his deposition he would never sell something that he thought was unsuitable to a customer. And as you noted, suitability is based on a number of factors, including risk tolerance, net worth, liquidity concerns. And so there was no suitability concerns that he raised for himself because he would never sell a policy that violated the suitability requirements, nor did he have a specific example of anyone at MetLife who violated those suitability concerns. I asked him those questions specifically. Also, what's very important and what Mr. Canton knew is that anomalies with pricing exist. As you saw from the record, one of these insurance policies can have over a million cells or hypothetical scenarios based on the spouses and their relative ages and their health classifications. The pricing was within profitability. It just wasn't in that narrow margin that MetLife liked. And he was told that they would consider it on the next reprice. And so what happens when there are issues that are raised with pricing or through a process that MetLife does automatically, so MetLife goes through on a quarterly basis and takes the expected returns based on what's actually happening in the marketplace and then determines whether a reprice is needed. Mr. Canton knew this because in his December letter he said this can't wait for the next reprice. Well, that's not a reasonable basis because he didn't know of anyone who had sold the policy. So why couldn't it wait for the next reprice? And, again, these were prices that were transparent. There was no fraud to the customers. And people can walk with their feet if they like a policy that's better priced at another insurance company. So the next issue is, although the court did not reach it, there's no causal nexus between the decision to terminate his contract and the purported issues that he raised. As I said, he had been raising issues throughout his career. Let me go back. I mean, the causal nexus is not what the district court went off on, right? I mean, that would be an alternative basis for summary judgment that we would have to reach that the district court did not. That's right. Okay. So let's stick with what the district court did say. I take it you're telling me that there is nothing unlawful about whatever price the insurance company wants to charge for a policy? Is that the point? That it might be that there's a fraud perpetrated on a customer if a salesman says this is a great policy for you, if that salesman knows or should know that this is an overpriced policy and that MetLife itself offers another product that is more suitable for that person? Right. That would be a situation where the particular FSR, the financial sales representative, would have been violating his suitability obligations under FINRA. And the case law is mixed as to whether a FINRA concern is actually a Sarbanes-Oxley concern. But that's not the issue because there is no suitability issue here. And I'm not suggesting that Mr. Kenton necessarily said this in so many words, but if he had said, you know, we've got a problem because there are people out there who aren't as sophisticated as I am about looking into our prices who might wind up selling unsuitable policies to people because these have their attractive features that the salesman might want to promote, but in fact you could get the same result cheaper from another MetLife policy and the prices are wrong and that's causing a problem. Is that having a reasonable belief that there's fraud? In other words, the argument that Kenton didn't say that, but if he did say that, that would be a legitimate Sarbanes-Oxley concern, or is the argument that that's not a Sarbanes-Oxley whistleblower? So in that hypothetical concern, which is not this case, I would say that that's still not enough because he would need to identify some sort of practice at MetLife that was causing or likely to cause these salespeople who have their own independent license obligations to do that. It's not enough just to say that could happen at any time, and Nielsen speaks to that. It can't be just the hypothetical. It has to be probable or likely to occur. So turning to the actual legitimate reasons for his termination, Ms. Pedigo is a vice president who oversees over 1,600 field representatives and then additional agents. She, in the first quarter of 2011, asked Felix Maleksi to go back and look at the overall administrative costs of what was going on in all of her areas of authority. And she was looking at not just Mr. Kenton's administrative expenses, but she was looking at others where there were high expenses going on relative to the profitability of that person, and with respect to Mr. Kenton, he had five administrative assistants in an area where, for example, in Manhattan, there were only five to cover 100 field representatives, and he had five covering six because he had those people doing very manual issues. He actually asked for a sixth administrative assistant, and when that request was denied, legitimately so, he went over her head and appealed to her manager, who also disapproved of the request. And Ms. Pedigo and Mr. Maleksi also- But as Judge Lynch pointed out, if this wasn't the basis for the district court's decision, why are you spending so much time on this? Oh, Your Honor, I am just- Because he started off by saying how great an employee he was? Is that the reason? Yes, and you have an independent basis to affirm based on the causal nexus or on the clear and convincing evidence of the legitimate reasons for his termination. But it's clear that there's no protected activity. There was no product sold. There was no suitability concerns. And so if you don't have any further questions, I'll rest. Thank you, Ms. Boudreaux. Thank you. Mr. Gabor, you've reserved three minutes. Thank you. Mark Riley testified at deposition that he knew that Canton's concern wasn't individual cells, but it was the product itself. Riley also testified that he has no idea whether Canton's concerns could be found in any other cells because they never tested them. They never did check his numbers. So they talk about a repricing, a check, but that never took place. They did not go back. They did not re-look at the numbers. And Riley made it very clear that he understood where Canton's coming from, but they weren't going to do anything about it, and he was under orders from Steigerwald to not waste time on this. Now, at the same time, when Canton also recognized the issue on the commissions, which he identified approximately two and a half months before he was fired, and then in October of 2012, he's told at that point, when he thinks that the way they're paying the commissions, he's told, a lot of people are angry with you because of this. That's important because, again, we go back to what he reasonably believed. Now, why would he be? I don't understand this commission issue at all. The commissions are laid out how the commissions are going to be classified as first year or not. Right. And some are reclassified into first year, and that gives the salesman a bigger commission. If you pay the second-year premium before the anniversary date, there are situations where you get a much, much larger commission, over 100 percent versus 3 or 5 percent. I forget the exact numbers. And these are policies where it's up to the policyholder when they pay beyond whatever is the basic required premium. Correct. Strangely enough, Canton was never aware of that prior to the fall of the ‑‑ I'm sorry, the summer of 2012. I don't understand. What is unlawful about deciding how you're going to credit the commissions? If they said, we're going to credit any commission within the first year and a half for the larger rate, just said that flatly rather than saying it's a first year, but we're going to deem things within a certain period to be in the first year. What's the difference? Canton's concern was, and Ricci supports that in his declaration, that if salespeople are getting much larger commissions than they're actually entitled to, then your pricing of your product is out of whack. MetLife is not taking enough money in. It wasn't more than they were entitled to. I'm sorry? It wasn't more than they were entitled to. It was what the company decided to pay as a commission. Canton thought it was a loophole, that if you get paid before the anniversary, he thought it's a loophole that people were getting much larger commissions, and that's buttressed by the comment that he received from Alston, saying everybody's mad at you because you're trying to close a loophole. And at the same time, Vitri also thought it was a loophole, and he thought ‑‑ I don't understand what's the problem with loopholes. It either says or it doesn't say that they get the commission. No salesperson is defrauding MetLife by reporting when the premiums are paid, if indeed he even reports that, because I take it Mr. Canton didn't have any idea. The commission check comes. If I sell a product for $100 and I get a 10 percent commission, I get my $10. That's what Canton thought people were entitled to, but when he found out they were getting $17, $18, $19 for that one sale, he said that's problematic, and he went to Kevin Finneran and talked to Kevin Finneran about it. Kevin Finneran, also a very experienced person, said we need to do research and look into it, and then he goes to Alston, and Alston says people are now very angry with you about this, and a month later he's fired. I'm still trying to focus on what is it that makes that a complaint that someone reasonably believed that there's some illegality or fraud going on. If the commissions are excessive, that's like some of the cases that we pointed to, like the Glodich case where if there's an overcharge for something, that could be a SOX issue. He thought the salespeople are getting much more than they are entitled to receive simply because the commission's paid early. That's definitely not reasonable because he didn't look to see that this was actually what the practice and policy was. His making the complaint about it and then taking it to the product committee was how he handled it. He was looking into it, and he had been there for a long time, and he had been on that product committee for a long time, and several other experienced people were not even aware of that loophole that existed. But the problem with that loophole is if the salespeople are making more than they otherwise should make, then you've got a situation that's serious. I don't understand where the word should comes from. The company decides how much commission it's going to pay, right? Right. First year commission is a very high percent. Every year after that is a much, much, much lower percent. They calculate what counts as first year a particular way. Is there any argument at all left in this case that, in fact, somebody was cheating, that somebody was not applying what the company's rules actually were? No. The argument is if you pressure people to pay early on their commissions. Well, did he complain that somebody's out pressuring people? No. No, of course not. That's what would be presumably at some level illegal, although I'm not sure it even would be. If an agent comes to me and says, you can prepay this commission, and I say, well, why would I want to do that? And he says, because it gives me a bigger commission. He presumably doesn't say that. He either says, honestly, there is some benefit to you in paying additional premiums, or he lies. If he lies, it's a fraud. If he says, well, you're building up equity in the policy, and that's a good thing, and I say, oh, that's probably a good thing. I'll do that. Who's defrauded? What is wrong? I don't understand where the illegality is. My commission is $10 for the first year. If the person pays their second-year premium before the anniversary, instead of receiving $1 for year two, I now can receive $8 for year two. Good for you, then. Congratulations. And that was the point raised. The company presumably would like that to happen, and if you get that to happen in a way that is not defrauding somebody,  What is the problem? The problem is, and as Vietri pointed out, the product wasn't priced based upon the higher commissions paid to the salespeople, which means MetLife is receiving less money than it should to cover that product. It's MetLife's choice, and you're well over your time. Thank you. Thank you very much. We'll reserve decision in this case. Thank you.